SEGAN CONSTRUCTION CORP., Plaintiff,

v.

NOR–WEST BUILDERS, INC. and Jack Cooper, Defendants.

Civil No. 10898.

United States District Court
D. Connecticut.

Aug. 9, 1967.

Sidney Vogel, of Vogel, Sigsway, Seidman & Harris, Norwalk, Conn., for plaintiff.

Lawrence C. Hirsch, of Weinstein & Weinstein, Norwalk, Conn., for defendants.

TIMBERS, Chief Judge.

Plaintiff brought this diversity action to recover amounts allegedly owing and unpaid in connection with carpentry work performed under a construction subcontract.

Following trial on the merits to the Court without a jury, the Court makes the following findings of fact and conclusions of law, pursuant to Rule 52(a), Fed.R.Civ.P.

## FINDINGS OF FACT

1. Plaintiff, Segan Construction Corp., being a New York corporation and having its principal place of business in New York, is a New York citizen. Individual defendant Jack Cooper is a citizen of Connecticut; corporate defendant Nor-West Builders, Inc. (hereinafter "Nor-West"), being a Connecticut corporation and having its principal place of business in Connecticut, is also a Connecticut citizen. The amount in controversy exceeds $10,000, exclusive of interest and costs.

2. On some date prior to May 12, 1964, defendant Cooper acquired title to a certain parcel of real estate bordering on County Street, in Norwalk, Connecticut,[1] and continued to hold said property in his own name during the period of time here involved.

3. On January 2, 1964, defendant Nor-West was incorporated under the laws of the State of Connecticut. Defendant Cooper became a director, and also president and treasurer, and was the sole stockholder. Nor-West began business with the sum of $1,000, which sum still constitutes the entire capitalization of the organization, and represents the amount contributed to capital by the sole stockholder Cooper.

4. On May 12, 1964, plaintiff and Nor-West entered into a written contract[2] for the performance of the carpentry aspect of construction of a garden apartment complex contemplated with respect to Cooper's County Street property in Norwalk. Signing on behalf of Nor-West was its president, Jack Cooper.

5. The contract called for plaintiff to perform all work customary in the carpentry trade, and fixed a total contract price of $86,300.00.[3] Monthly progress

---

1. As more particularly described in Plaintiff's Exhibit 2.

2. Plaintiff's Exhibit 2.

3. $1500.00 of that price represented contingent compensation for the hanging of doors, and is included in the total con-

payments were intended, with payments for work completed by the 20th of a certain month to be rendered in full by the 15th of the following month; no fixed time was set for completion of performance, although the written agreement expressly stated that time was of the essence.[4]

6. It was subsequently agreed to and understood by the contracting parties that billing and payment would be computed on a per building basis, with the total contract price divided by the number of buildings to be constructed, and the number of such resulting units of payment due each month to be determined by the number of buildings in which carpentry work had been completed.

7. Similar agreement was reached in November of 1964 when the billing and payment method was changed over to an individual apartment basis, with the total contract price divided by the number of separate apartments to be constructed, and the number of such resulting units of payments due each month to be determined by the number of individual apartments in which carpentry work had been completed.

8. In both of the above methods employed in calculating amounts due as progress payments, the basic unit of payment was further subdivided, with 60% of its value assigned to rough framing work, 20% to exterior trim work, and 20% to interior trim work.

9. On May 20, 1964, Nor-West entered into a written contract[5] with Cooper by which it assumed the responsibilities of general contractor for over-all construction to be carried out on Cooper's County Street property, in exchange for a maximum total contract price of $1,542,723.00, representing estimated actual cost of construction. Jack Cooper signed the instrument as the individual property owner, and was also the signatory on behalf of Nor-West.

10. The County Street enterprise constitutes the only construction work in which Nor-West has been engaged during the time of its corporate existence.

11. At some date between mid-June and the latter part of July, 1964, plaintiff commenced work under its carpentry subcontract with Nor-West.

12. As plaintiff's work progressed, monthly bills were submitted to Nor-West. Analysis of the value of plaintiff's work to date of submission of a particular bill would be conducted on the construction site by Sidney Abrams, employed by Nor-West in the capacity of project manager and owner's representative; Abrams would then recommend approval of a certain amount for payment, at times following discussions with Leon Segal, plaintiff's president, and Cooper would sign payment checks in accordance with the recommendation from Abrams.

13. Although such general contractor approval procedure was in itself contemplated by the terms of plaintiff's contract with Nor-West,[6] differences of opinion between the parties arose and continued with respect to the appropriate value to be assigned to plaintiff's mounting level of overall performance, with plaintiff of the opinion that it was accomplishing more than it was being given credit for.

14. In the course of plaintiff's performance, further differences arose over particular items of work, which plaintiff considered to be "extras" requiring compensation over and above the original contract price. No written authorization for such extras was executed,[7] and plaintiff did not include such items in its regular monthly billing. Plaintiff did install as an extra, under oral order from Jack Cooper, 32 metal sleeves for air-conditioning units.

tract price since it is undisputed that plaintiff did undertake to perform such work.

4. Plaintiff's Exhibit 2.

5. Plaintiff's Exhibit 6.

6. Plaintiff's Exhibit 2, Addendum B.

7. As required by the contract. Plaintiff's Exhibit 2, ¶7.

15. In November or December of 1964, Abrams noted certain omissions in plaintiff's work, and accepted the diminished value of performance occasioned thereby on the understanding that the contract price would be correspondingly lowered; this adjustment was also made without written authorization. These omissions involved use of fewer studs in apartment partitions, failure to install steel in certain buildings, changes in the structure of apartment balconies, and delegation of certain bathroom construction responsibilities to another contractor; the diminution in the value of plaintiff's contemplated performance amounted to $2,050.00. Certain other omissions were not accepted, and both plaintiff and Nor-West engaged in relatively minor corrective work.[8] The corrective work done by Nor-West employees was performed at a cost of $571.00 to Nor-West.

16. In spite of the above disagreements, both plaintiff and Nor-West continued in good faith their attempts to carry out their respective obligations under the contract.

17. On January 25, 1965, plaintiff submitted its customary bill for work done as of the 20th of that month. As of January 20, 1965, the total value of plaintiff's performance under the contract was $47,752.00, of which $38,903.89 had already been paid. Deducting the 10% retainage,[9] the sum then presently due, payable on February 15, 1965, was $4,072.91.

18. By this time, however, plaintiff had decided to bring the differences over valuation and extras to a head. After continuing work, mostly of a corrective nature,[10] for a couple of weeks, plaintiff halted performance on February 9, 1965.

19. No discussion of the contract disagreement was attempted by Nor-West, and the amount owing to plaintiff as of January 20 was not paid by the 15th of February. On February 15, 1965, plaintiff submitted a bill[11] which fully embodied its view of the value of its work to date, including extras, demanding over $19,000.

20. Nor-West refused to consider negotiations concerning payment; plaintiff did not resume performance; and Nor-West engaged carpenters, including some of plaintiff's workmen, to complete the work. The substituted performance was completed on October 14, 1965.

21. The total value of plaintiff's performance as of February 9, 1965, was $45,791.00.[12] With the total sum of $38,903.89 previously having been received as payment, the remaining value of work done for which no payment had been rendered was in the amount of $6,887.11.

22. Plaintiff commenced the instant action on March 30, 1965, seeking recovery against both Nor-West and Jack Cooper, individually, for the unpaid value of work done on the County Street construction project.

8. Required of plaintiff without additional compensation. Plaintiff's Exhibit 2, ¶6.

9. To be held by the general contractor until completion of the contract. Plaintiff's Exhibit 2, Addendum B.

10. The non-corrective work, requiring compensation, had a value of approximately $500.

11. Plaintiff's Exhibit 4.

12. $47,752.00 — total value of work as of Jan. 20, 1965.
$+ 500.00$ — value of non-corrective work between Jan. 20 and Feb. 9, 1965.
$+ 160.00$ — installation of 32 air-conditioning sleeves at $5.00 each: an
$\overline{\$48,412.00}$     "extra" performed under oral order.
$- 571.00$ — corrective work by Nor-West employees.
$- 2,050.00$ — diminution in value of plaintiff's performance by reason of work
$\overline{\$45,791.00}$     omissions agreed upon with Nor-West.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties to, and the subject matter of, this action.[13]

2. The contractual relationship upon which the action is founded is governed by the law of the State of Connecticut.

3. On May 12, 1964, plaintiff entered into a written contract with Nor-West, undertaking performance of certain carpentry work in connection with a contemplated garden apartment complex, in exchange for a total contract price of $86,300.00.

4. The carpentry contract called for installment payments payable on the 15th of each month in an amount representing the monthly increment of value of plaintiff's performance as of the 20th of the preceding month.

5. The contracting parties subsequently agreed to certain alterations in plaintiff's duties under the contract, diminishing the value of plaintiff's performance by the sum of $2,050.00.

6. Certain corrective work on plaintiff's behalf, of the value of $571.00, was carried out by Nor-West.

7. By further oral agreement, plaintiff undertook installation of air-conditioning sleeves as an extra, and did install 32 sleeves; the value of such performance was $160.00. The contractual requirement of a written order was waived by Nor-West.

8. As of January 20, 1965, plaintiff was entitled to receive payment of the sum of $6,387.11, less retainage.

9. Plaintiff's subsequent work stoppage on February 9, 1965, over the payment dispute, did not constitute breach of the contract by absolute and unequivocal abandonment.

10. The failure of Nor-West to pay any part of the sum due plaintiff by February 15, 1965 was a material breach of contract, excusing plaintiff from further performance and entitling plaintiff to recover the value of services rendered.

11. Nor-West was a mere instrumentality of the individual defendant, Jack Cooper, and plaintiff is therefore entitled to judgment against both defendants in the amount of $6,887.11, representing the value of work done by plaintiff through February 9, 1965.

12. No material breach of contract on the part of plaintiff having been established, defendants' counterclaims should be dismissed.

## OPINION

■ There is no dispute concerning the validity of the carpentry subcontract between plaintiff and Nor-West. It is also unquestioned that the substantive rules of law of the State of Connecticut govern the contractual relationship between the parties.[14]

Although subsequent oral modifications did take place the basic outlines of the written contract of May 12, 1964 [15] remained unchanged; the central controversy in this case is whether or not plaintiff breached its contract by abandoning performance without justification. Having fully considered the areas of undisputed fact, and having weighed conflicting testimony offered on behalf of the respective parties in accordance with the recognized tests of credibility,[16] the Court has arrived at the findings of fact and conclusions of law set forth above.

13. 28 U.S.C. § 1332(a) (1) and (c).

14. See Guaranty Trust Co. of New York v. York, 326 U.S. 99 (1945). Although the evidentiary record leaves open the possibility that the contract was executed outside of Connecticut, since the operative effect and place of performance were to be in Connecticut, Connecticut's substantive rules of contract law will be applied. See Jenkins v. Indemnity Insurance Co. of North America, 152 Conn. 249, 253, 205 A.2d 780, 782–783 (1964).

15. Plaintiff's Exhibit 2.

16. See, e. g., Lomartira v. American Automobile Insurance Company, 245 F.Supp. 124, 131 (D.Conn.1965), aff'd, 371 F.2d 550 (2 Cir. 1967); Locke Manufacturing Companies v. United States, 237 F.Supp. 80, 89 (D.Conn.1964).

It is incontestable that serious differences of opinion existed between the contracting parties as to the value of plaintiff's monthly work. Plaintiff's billing estimates were significantly reduced by the Nor-West project manager, Abrams, in his recommendations for payment, sometimes reached in the absence of any discussion with plaintiff's president, Leon Segal. Nor-West employees were detailed to carry out certain items of corrective work which plaintiff considered unjustified. In addition, plaintiff considered that it was being called upon to do many extra items not covered by the original contract, with only vague promises of future payment in exchange.

On January 25, 1965, plaintiff submitted its last regular bill, which was again discounted by Abrams upon receipt. By the terms of the contract, plaintiff had performed its condition precedent to the right to receive payment under that installment, in having completed its work up to January 20, 1965; the only remaining duty was Nor-West's, to pay the installment in full by February 15, 1965.[17]

On February 9, 1965, however, plaintiff halted work because of the overall payment dispute. Nor-West then refused to pay the sum already due.

It is clear that Nor-West considered the work stoppage a breach of contract, but the evidence does not reveal that absolute and unequivocal final abandonment of contractual obligations which constitutes breach in these circumstances.[18] Nor-West's conclusion was premature, reached without attempted negotiation, discussion or investigation; moreover, in withholding payment of an installment unconditionally owing, Nor-West itself breached a material provision of the contract, and plaintiff was thereby excused from further performance[19] and entitled to recover the reasonable value of services rendered.[20]

Assessment of the value of plaintiff's actual performance, however, is a matter of some difficulty, for the oral testimony at trial was highly conflicting and the documentary evidence scanty.[21] In balance, defendants' estimate of the value of plaintiff's work as of the date of receipt of the last regular bill in January of 1965 seems more realistic and more consistent with the entire evidentiary record; this item includes the 10% overall retainage, since the Court is here concerned with the actual value of services rendered.[22] Plaintiff's calculations of the number of apartment units finished, or even partially completed, were somewhat exaggerated and did not stand up under cross-examination. Similarly, plaintiff's extensive list of "extras" is not convincing; although the Court is persuaded that frequent adjustments of contract duties with respect to particular items of work were agreed upon orally as construction progressed, plaintiff has not proved its contention that the enumerated "extras"[23] actually consisted of items beyond the scope of the contractual obligation to perform all work ordinarily

17. Plaintiff's Exhibit 2, Addendum B.

18. See M. Shapiro & Son Construction Co. v. Battaglia, 138 Conn. 238, 244, 83 A. 2d 204, 207 (1951); Wonalancet Co. v. Banfield, 116 Conn. 582, 586, 165 A. 785, 786–787 (1933).

19. See Morici v. Jarvie, 137 Conn. 97, 99–102, 75 A.2d 47, 49–50 (1950); cf. Li-Volsi Construction Co. v. Shepard, 133 Conn. 133, 136, 48 A.2d 263, 265 (1946).

20. See Greco v. Morcaldi, 145 Conn. 685, 690, 146 A.2d 589, 592 (1958).

21. Neither Nor-West nor plaintiff prepared written analyses, as the construction progressed, in support of their differing contentions as to the value of plaintiff's performance. Plaintiff's Exhibit 5 consists of time sheets for its employees during the period in question, but is only tangentially relevant to a determination of the extent of performance successfully achieved; in this regard, defendants also rely almost exclusively upon oral testimony received on their behalf at the trial.

22. See Greco v. Morcaldi, supra note 20.

23. Plaintiff's Exhibit 4.

included in the carpentry trade.[24] There is one exception, admittedly outside the bounds of the contract, which is labor expended in installing metal sleeves for reception of air-conditioning units.[25] Beyond that, plaintiff has also been given appropriate credit for performance between the January bill and February 9, 1965, the value of which was considerably diminished by the fact that the greater part was corrective work.[26]

On the other hand, adjustments were made which reduced plaintiff's duties significantly, and correspondingly lessened the value of work done. In addition, Nor-West's employees were called upon to correct some of plaintiff's work during the life of the contract, and that expense must be set off against the value of plaintiff's overall performance.[27]

There remains the question of plaintiff's right to recover from Jack Cooper individually. The Court is mindful that a separate corporate entity ordinarily should be recognized, in the absence of fraudulent abuse of the privilege of acting in corporate form, even if the corporation is devised for the exercise of very limited and special functions and is under the virtually exclusive ownership of one person.[28] But the interests of justice require courts to disregard the corporate fiction, to impose liability upon the individual who is the real actor, whenever it appears that the individual and the corporation are one and the same for all practical purposes, or that the corporation is the mere instrumentality of the individual.[29] The factors compelling imposition of individual liability plainly appear in this case, as Nor-West had no practical existence apart from the actions of Cooper in connection with the development of his County Street real estate. Cooper was president, treasurer, director, and sole stockholder of Nor-West,[30]

---

24. Plaintiff's Exhibit 2, ¶4. Indeed, plaintiff charged one item, "redistributing" delivered lumber, which appears to have been its express responsibility under the contract. Plaintiff's Exhibit 2, Addendum B.

25. Although such an extra should have been requested by means of a written order, Plaintiff's Exhibit 2, ¶17, that contract requirement was effectively waived by Cooper's placing an oral work order. See, e. g., Von Langendorff v. Riordan, 147 Conn. 524, 528, 163 A.2d 100, 102 (1960); Wexler Construction Co. v. Housing Authority, 144 Conn. 187, 193, 128 A.2d 540, 543 (1956).

26. For which no additional compensation could be charged. Plaintiff's Exhibit 2, ¶6.

27. Plaintiff's Exhibit 2, ¶6. Although defendants' counterclaims must be dismissed in any case, since it has not been established that plaintiff breached its contract, it is worthy of note that Nor-West could not claim its corrective work prior to February 9, 1965 as showing breach by defective performance, for such corrective operations are explicitly contemplated by the contract, with only the necessary expense involved to be charged to the subcontractor. Plaintiff's Exhibit 2, ¶6. Nor-West has also failed to show interference with other contractors' timetables caused by defective performance on the part of plaintiff; in any event, any such claim of breach would have been waived by defendants' having continued to treat the disputes as matters for adjustment and settlement rather than for suit. See Lee v. Casualty Co. of America, 90 Conn. 202, 206–208, 96 A. 952, 954 (1916).

It should also be noted that defendant Jack Cooper's counterclaim for loss of rents could not be entertained as a proper item of contract damages; no causal link was established between plaintiff's departure and the extraordinary delay in completion of the apartment complex, and even if a causal chain could be made out, the damages occasioned would still be conjectural, remote, and outside the contemplation of the contracting parties. See Cohn v. Norton, 57 Conn. 480, 490–491, 18 A. 595, 596 (1889).

28. See, e. g., Kulukundis v. Dean Stores Holding Co., 132 Conn. 685, 689, 47 A. 2d 183, 184 (1946).

29. Zaist v. Olson, 154 Conn. 563, 573–576, 227 A.2d 552, 557–558 (1967).

30. Plaintiff's Exhibits 7 and 8.

a corporate form created for Cooper's convenience in handling the County Street project. As the property owner, Cooper entered into a contract with himself, as an officer of Nor-West, for development of the land; with total assets of $1,000, representing Cooper's contribution of capital, Nor-West undertook performance of a $1,500,000 contract, waiving all rights to a margin of profit in return.[31] It is evident that Cooper arranged and controlled all significant matters of policy 'as both individual owner and corporate contractor; the commingling of interests and identities was so pronounced that Abrams, employed by Nor-West, described his role in the construction enterprise as that of both project manager and owner's representative. The corporation was simply a form to be used by Cooper for his individual advantage, in an attempt to avoid essentially all risk by raising the shield of limited liability through creation of an inadequately capitalized company.[32] In such circumstances, personal liability may not be evaded.[33]

## ORDER

Plaintiff having proved a material breach of contract by defendants, excusing it from completion of performance, and plaintiff therefore being entitled to judgment in its favor, for the value of services rendered, against both defendants in the amount of $6,887.11; and

Defendants having failed to prove breach of contract by plaintiff, and plaintiff therefore being entitled to judgment in its favor dismissing defendants' counterclaims;

The Clerk is directed to enter judgment accordingly.

31. Plaintiff's Exhibit 6.

32. Such severe undercapitalization is not a factor which the Court may ignore. See Zaist v. Olson, supra note 29, at 569, 227 A.2d at 555.

33. See Zaist v. Olson, supra note 29, at 577–578, 227 A.2d at 559. Defendant

Cooper's original defenses of waiver and estoppel in this regard, by reason of plaintiff's entry into a contract with Nor-West alone, are not persuasive; they were neither supported by any evidence offered at the trial nor pressed in the subsequent briefs.